IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ELIM ROMANIAN PENTECOSTAL CHURCH, <br> LOGOS BATIST MINISTRIES <br><br> Plaintiff, <br><br> v. <br><br> JAY ROBERT PRITZKER, <br> in his official capacity as Governor of the <br> State of Illinois, <br><br> Defendant. | Case No. 20 C 2782 <br><br> Judge Robert W. Gettleman |

### MEMORANDUM OPINION AND ORDER[1]

"These are the times that try men's souls."[2] Illinois, the nation, and the world are in the grip of a deadly pandemic the likes of which haven't been experienced in more than a century. As of yesterday, May 12, 2020, Illinois has experienced more than 83,000 known infections and more than 3,600 deaths from the COVID-19 virus, with more than 4,000 new cases and 144 new deaths reported on that date alone. In the nation, some 1.4 million cases and 82,000 deaths have been reported. In the world, more than 291,000 have died from the disease, which has infected more than 4 million people.

The virus is highly contagious and easily transferable. Because people may be infected but asymptomatic, they may be infecting others without knowing. At this time there is no known cure, no effective treatment and no vaccine. The only preventative measures agreed upon by all medical experts is to avoid contact with infected persons. To that end people have been cautioned to stay at home if at all possible, practice social distancing when it is not, and to wear face coverings when

---

[1] The facts discussed in this opinion are uncontested and principally taken from the parties' submissions.
[2] Thomas Payne, "The Crisis" (December 23, 1776).

coming near others. Despite the dire numbers and warnings, some people have refused to comply, causing governors across the country to issue what have been described as "stay-at-home" orders. Defendant Governor Jay Pritzker has issued a number of such orders, including, Executive Order 2020-32 (the "Order"), which requires wearing a face covering in public places or when working, the cessation of all non-essential business and operations, and most importantly for the instant case, prohibits "All public and private gatherings of any number of people occurring outside a single household or living unit" except for limited purposes. "[A]ny gathering of more than ten people is prohibited unless exempted …" Individuals may leave their residences only to perform certain "Essential Activities" and must follow social distancing requirements set forth in the Order, including wearing face coverings when in public and work. Among the Essential Activities listed is "to engage in the free exercise of religion." That provision of the Order provides:

> To engage in the free exercise of religion, provided that such exercise must comply with Social Distancing Requirements and the limit on gatherings of more than ten people in keeping with CDC guidelines for the protection of public health. Religious organizations and houses of worship are encouraged to use online or drive-in services to protect the health and safety of their congregants.

Plaintiffs have sued Governor Pritzker, challenging the Order to the extent that it restricts religious gatherings to ten persons, arguing that it violates numerous of their federal constitutional rights, most notably the right to free exercise of religion contained in the First Amendment. They filed their complaint on Thursday, May 7, 2020 at 11:16 p.m. and their motion for a temporary restraining order ("TRO") and preliminary injunction at 1:47 a.m. Friday, May 8, 2020. The motion sought a TRO enjoining defendant from enforcing the Order against them starting on Sunday, May 10, 2020. The court ordered defendant to respond to the motion by 5:00 p.m.

Saturday May 9, 2020 with plaintiffs to reply by 5:00 p.m. Sunday, May 10, 2020. Because of the briefing schedule, the court denied the request for a TRO effective for May 10, 2020.

Undeterred by the court's refusal to grant the TRO motion, plaintiff Elim Romanian Pentecostal Church ("Elim") elected to disobey the Order and hold services at its church with more than the allotted ten persons. The pictures that plaintiffs have included in their reply show that none of the congregants were wearing face coverings, contrary to CDC guidelines. Because plaintiffs' reply brief contained new factual matter, the court granted defendant leave to file a sur-reply by noon on Tuesday, May 12, 2020, with no further briefing to be accepted. Nevertheless, plaintiffs submitted a response to the sur-reply, principally to contend that the congregants and clergy were social distancing. The motion is now fully briefed and ready for resolution. For the reasons described below, the motion is denied.

Temporary restraining orders and preliminary injunctions, are extraordinary and drastic remedies that should not be granted unless the movant, "by a clear showing, carries the burden of persuasion." Mazurek v. Armstrong, 520 U.S. 968, 972 (1997). The party seeking such relief must show that: 1) it has some likelihood of success on the merits; 2) it has no adequate remedy at law; and, 3) that without relief it will suffer irreparable harm. Planned Parenthood of Ind. and Ky, Inc. v. Comm'r of Ind. State Dep't of Health, 896 F.3d 809, 816 (7th Cir. 2018). If the movant meets these requirements, the court must then weigh the harm the movant will suffer without an injunction against the harm the non-movant will suffer if an injunction is issued. The court makes this assessment using a sliding scale. The more likely the movant is to win, the less heavily need the balance of harm weigh in its favor. The less likely the movant is to win, the more the balance must weigh in its favor. Finally, the court must also determine whether the injunction is in the

public interest, taking into account any effects on non-parties. Courthouse News Serv. v. Brown, 908 F.3d 1063, 1068 (7th Cir. 2018).

## Likelihood of Success on the Merits

Plaintiffs need show only that their chances of success are better than negligible. Ill. Council on Long Term Care v. Bradley, 957 F.2d 305, 310 (7th Cir. 1992). Plaintiffs' complaint challenges the Order on both federal and state constitutional grounds, as well as on state statutory grounds. Their motion, however, raises only that the Order violates their First Amendment Rights to Free Exercise of Religion and to "Be Free from Government Hostility and Disparate Treatment Under the Establishment Clause," and that the Order restricts their First Amendment rights to speech and assembly.

Over one hundred years ago the Supreme Court established a framework governing the emergency exercise of state authority during a public health crisis. Jacobson v Commonwealth of Mass., 197 U.S. 11, 27 (1905). The "liberty secured by the Constitution … does not import an absolute right in each person to be, at all times and in all circumstances, wholly freed from restraint." Id. at 26. "Even liberty itself, the greatest right, is not unrestricted license to act according to one's will." Id. "[A] community has the right to protect itself against an epidemic of disease which threatens the safety of its members." Id. at 28. As the Court explained, "[t]he possession and enjoyment of all rights are subject to such reasonable conditions as may be deemed by the governing authority of the country essential to the safety, health, peace, good order, and morals of the community." Id. at 26-27 (emphasis added).

In Jacobson, the Court was faced with a claim that the state's compulsory vaccination law enacted during the smallpox epidemic violated the Fourteenth Amendment. Rejecting the claim,

4

the court described the state's police power to combat an epidemic, id at 29:

> In every well-ordered society charged with the duty of conserving the safety of its members the rights of the individual in respect of his liberty may at times, under the pressure of great dangers, be subjected to such restraint, to be enforced by reasonable regulations, as the safety of the public may demand.

Courts have acknowledged this principle numerous times, applying it to various constitutional claims. For example, in Compagnie Francaise de Navigation a Vapeur v. State Bd. of Health, 186 US 380 (1902), the court upheld Louisiana's right to quarantine passengers aboard a vessel despite the fact that all were healthy. And in Prince v Mass., 321 U.S. 158, 166-67 (1944), the Court stated "[t]he right to practice religion freely does not include the liberty to expose the community … to communicable disease." Under such emergency circumstances, such as when faced with a society-threatening epidemic, "a state may implement emergency measures that curtail constitutional rights so long as the measures have at least some 'real or substantial relation' to the public health crisis and are not 'beyond all question, a plain, palpable violation of rights secured by the fundamental law." In re Abbot, 954 F.3d 772, 784-85 (5th Cir. 2020) (quoting Jacobson, 197 U.S. at 31).

As described above, there is no question that the world, the country, and Illinois in particular are in the midst of a deadly pandemic of epic proportions. Plaintiffs do not dispute that COVID-19 threatens the lives of the citizens of Illinois and all Americans. The court finds, as did the court in Cassell v Snyders, 2020 WL 2112374 at *7 (N.D. Ill. May 3, 2020), that the COVID-19 pandemic qualifies as the type of public health crisis that Jacobson contemplated. That finding means that to have any likelihood of success on the merits plaintiffs must demonstrate either that the Order has no real or substantial relation to the public health crisis or that it is a plain,

palpable invasion of their rights. They have failed to demonstrate either. Indeed, nowhere in any of their briefs do they cite Jacobson or mention its standard. As a result, because Jacobson is implicated by the current health crisis, and because the Order advances the State's interest in protecting its citizens from the pandemic, the court concludes that plaintiffs have a less than negligible chance of success on their constitutional claims.

Moreover, even if Jacobson's emergency crisis standard does not apply, plaintiffs have failed to show any likelihood of success under traditional First Amendment analysis. The Free Exercise Clause of the First Amendment (applied to the states through the Fourteenth Amendment) provides that "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof …." It prohibits government from "[p]lacing a substantial burden on the observation of a central religious belief or practice without first demonstrating that a "compelling governmental interest justifies the burden." St. Johns United Church of Christ v. City of Chicago, 502 F.3d 616, 631 (7th Cir. 2007). In Employment Division v. Smith, 494 U.S. 872, 883 (1990), however, the Supreme Court held that neutral laws of general applicability do not violate the Free Exercise Clause even if they have the incidental effect of burdening a particular religious practice, and thus need not be justified by a compelling governmental interest. Put another way, a "neutral law of general applicability is constitutional if it is supported by a rational basis." Ill. Bible Colleges Ass'n v. Anderson, 870 F.3d 631, 639 (7th Cir. 2017). Neutrality and general application are interrelated, and failure to satisfy one likely indicates a failure to satisfy the other. Church of the Lukkumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 531 (1993).

Whether a law qualifies as neutral depends on its object. A law is not neutral if "the object of the law is to infringe upon or restrict practices because of their religious motivation." Lukumi,

508 U.S. at 533. General applicability forbids the government from "imposing burdens only on conduct motivated by religious belief in a selective manner." Id. In short, if the Order does not target religion, "the First Amendment has not been offended." Employment Division, 494 U.S. at 878.

In the instant case, plaintiffs have provided no evidence that the Order targets religion. They point to the Order's exemptions for essential businesses that may host more than ten people and argue "if large gatherings at liquor stores, warehouse supercenters, and cannabis stores are not prohibited – and distancing and hygiene practices are only required to the greatest extent possible – even though endangering citizens (or not) to an equal degree, then it is obvious religious gatherings have been targeted for discriminatory treatment." The court disagrees.

Gatherings at places of worship pose higher risks of infection than gatherings at businesses. As Judge Lee explained in Cassell, 2020 WL 2112374 at *9, when analyzing the same Order:

> [I]n person religious services create a higher risk of contagion than operating grocery stores or staffing manufacturing plants. The key distinction turns on the nature of each activity. When people buy groceries, for example, they typically enter a building quickly, do not engage directly with others except at point of sale, and leave once the task is complete. The purpose of shopping is not to gather with others or engage them in conversation and fellowship, but to purchase necessary items and then leave as soon as possible.
> By comparison, religious services involve sustained interactions between many people … Given that religious gatherings seek to promote conversation and fellowship, they "endanger" the government's interest in fighting COVID-19 to a "greater degree" than the secular businesses that Plaintiffs identify.

Plaintiffs do not address Cassell's reasoning (they don't even cite it in their reply) except to argue in their initial motion that COVID-19 does not care about people's intentions - what matters is hygiene and social distancing. That distorts Cassell's reasoning and common sense. The

7

congregants do not just stop by Elim Church. They congregate to sing, pray, and worship together. That takes more time than shopping for liquor or groceries. The word "congregate," from which the term "congregation" derives, means to "gather into a crowd or mass." Indeed, the church's YouTube channel lists a live recording from last Sunday's service that was one hour, forty-seven minutes long, with virtually no one in the congregation or clergy wearing a face covering.

Plaintiffs also complain that the Order classifies law and accounting firms as essential, with no ten-person limit, suggesting that this somehow shows that the Order targets religion. Again, however, people do not go to those places to gather in groups for hours at a time. In this regard the court agrees with Judge Lee that a more apt analysis is between places of worship and schools, both of which involve "activities where people sit together in an enclosed space to share a common experience," exacerbating the risk of contracting the virus. Cassell, 2020 2112374 at *10. All public and private schools serving pre-kindergarten through twelfth grade students have been closed under other Executive Orders. And under this Order, theaters and concert halls, which clearly resemble the layout of plaintiffs' churches, are completely banned from hosting any gatherings.

As a result, the court concludes that the Order is both neutral and of general applicability. As such, it does not violate the Free Exercise Clause so long as it is supported by a rational basis. Anderson, 870 F.3d at 639. The Order, without doubt, is rationally based in light of the need to slow the spread of COVID-19 in Illinois. Consequently, the court concludes that plaintiffs have a less than negligible likelihood of success on the merits of this claim.

Plaintiff's Establishment Clause claim fares no better. "[T]he Establishment Clause prohibits government from abandoning secular purposes in order to put an imprimatur on one

8

religion, or on religion as such, or to favor the adherents of any sect or religious organization." Gillette v. U.S., 401 U.S. 437, 450 (1971). "Its central purpose is to ensure government neutrality in matters of religion." Id. at 449. To comply with the Establishment Clause, government action must: 1) have a secular purpose; 2) have a primary effect that neither advances nor inhibits religion; and 3) not foster an excessive government entanglement with religion." Lemon v Kurtzman, 403 U.S. 602, 612-13 (1972).

There is no doubt that the Order passes the Lemon test, and plaintiffs do not argue otherwise. Indeed, once again, they fail to address Lemon in any of their three briefs. In any event, the Order obviously has a secular purpose to prevent the spread of COVID-19. Its primary effect neither advances nor prohibits religion. It does not favor one religion over another, or religion as such. Plaintiff's argument that the Order inhibits religion because it does not limit other essential businesses to ten persons or fewer fails for the same reason its Free Exercise Claim fails. Finally, the Order in no way fosters government entanglement with religion. Consequently, the court concludes that plaintiffs have a less than negligible change of success on their Establishment Clause claim.

Nor do plaintiffs have even a negligible change of success on their Free Speech and Assembly claim. The First Amendment bars the government from "abridging the freedom of speech." A law must pass strict scrutiny when it restricts speech based on content. A speech restriction is content-based when "it applies to particular speech because of the topic discussed or the idea or message expressed." Reed v. Town of Gilbert, Ariz., 576 U.S. 155 (2015). A commonsense meaning of content-based requires the court to consider "whether a regulation of speech on its face draws distinctions based on the message the speaker conveys." Id. (internal

9

quotations omitted). Some such distinctions are obvious, such as defining speech by particular subject matter; others are more subtle, defining regulated speech by its function or purpose. "Both are distinctions drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny." Id. Additionally, some facially content neutral laws will be considered content-based regulations of speech if they "cannot be justified without reference to the content of the regulated speech, or that were adopted by the government because of disagreement with the message the speech conveys." Id.

Plaintiffs have failed to present any evidence to demonstrate that the Order is based on the content discussed at churches or the ideas or messages expressed. They again rely on the exemptions for other essential businesses that are not restricted to gatherings of ten persons. From this, plaintiffs conclude that the Order restricts religious speech because it is religious speech. Once again, the court disagrees.

As noted in Cassell, the Order has nothing to do with suppressing religion and everything to do with reducing infections and saving lives. There is no evidence that defendant has a history of animus toward religion. Cassell noted the example of a church choir practice in Washington State where members actually used hand sanitizer and practiced social distancing. Despite those efforts, forty-five of the sixty choir members contracted COVID-19 and two died. Cassell, 2020 WL 2112374 at *13. That example illustrates the purpose of the Order. Large gatherings magnify the risk of contagion even when participants practice preventative measures as plaintiffs claim they are prepared to do.³ Consequently, the court concludes that plaintiffs' chance of success on this claim is less than negligible.

---

³ As mentioned above, the pictures of the services held by Elim on Sunday, May 10, 2020, show that the participants were not wearing face coverings, as required by the CDC guidelines.

**Balancing of Harms**

Because plaintiffs have not shown a greater than negligible chance of success on the merits, they are not entitled to preliminary relief. But, even if they had a slight chance of success, under the sliding scale approach, the less likely their chance of success the more the balance of harms must weigh in their favor. Valencia v. City of Springfield, Ill., 883 F.3d 959, 966 (7th Cir. 2018). Because their likelihood of success is so remote, plaintiffs must show that the scales weigh heavily in their favor. They do not and cannot.

Indeed, quite the contrary is true. The harm to plaintiffs if the Order is enforced pales in comparison to the dangers to society if it is not. The record clearly reveals how virulent and dangerous COVID-19 is, and how many people have died and continue to die from it. "[T]he sad reality is that places where people congregate, like churches, often act as vectors for the disease." Cassell, 2020 WL 2112374 at *15. Plaintiffs' request for an injunction, and their blatant refusal to follow the mandates of the Order are both ill-founded and selfish. An injunction would risk the lives of plaintiffs' congregants, as well as the lives of their family members, friends, co-workers and other members of their communities with whom they come in contact. Their interest in communal services cannot and does not outweigh the health and safety of the public.

## CONCLUSION

For the reasons described above, plaintiffs' motion for temporary restraining order and preliminary injunction (Doc. 4) is denied.

**ENTER: May 13, 2020**

**Robert W. Gettleman**
**United States District Judge**